Next to argument in number 21 27 86 rise and shine Corporation versus PepsiCo. Good morning, your honors. It may please the court. I'm Dale Sindaly, and I represent appellant PepsiCo. The district court's preliminary injunction, halting the sale. I'm sorry, I didn't mean to interrupt you, but the time is counting down from past zero. Oh, that's weird. Sorry, let me. Okay, I apologize for the interruption. Go ahead. No, I appreciate more time. Thank you, your honor. The district court's preliminary injunction, halting the sale of PepsiCo's Mountain Dew Rise Energy drink, seven months after its launch, is inconsistent with this court's law of trademarks and injunctive relief. And there are four main errors I'd like to highlight today. First, the district court failed to grapple with the extensive and logical case law in this circuit that excesses the strength of a mark by looking not only at its Abercrombie classification, but to its origin indicating quality in the minds of the purchasing public. The district court gave no weight to the substantial evidence of third-party use of the word rise in the beverage market or to RBC's admissions to the PTO that there was a crowded field of companies using rise such that rise marks could peacefully coexist and are entitled to only a narrow scope of protection against virtually identical marks. Second, compounding this, the district court applied the wrong legal standard in assessing similarity and contravention of cases like the Charbucks case, Dentine Ice, and Miriam Webster. Rather than credit the substantial differences between the size, font, color scheme, house mark, and iconography of the products, the court unduly focused on the word rise, juxtaposing a term in isolation and contravention to the universal DocuCom opinion. And to be clear... Did it do that? I mean, is it just focused on the word rise? I mean, it talks about how the word rise is in boldface and occupies the top half of the can and so looks similar. Yes, it did do that, but that's all it did. When you look at the cans, they are startlingly different in ways beyond that. Even the typefaces are different, and the typeface of Pepsi's can... Well, the typefaces are similar in that they're both big and bold, right? It could be sort of thin and curly or something, right? It could be a bigger difference in font, so there is some similarity, and there are some differences. I mean, didn't the district court look at both of those? Yes, the district court looked at it, but as a matter of law, it did not look holistically at the overall impression as it was needed. And, in fact, I note for the court that the court's comparisons on page 2 of its order was inaccurate, as, among other things, it included two brightly colored RBC line extensions for citrus and blood orange, which, as we said in our brief and they don't contest, were long discontinued prior to our launch. And, in addition, the photos were cropped so that it made the cans look to be the same size, when a more realistic depiction of the cans at issue are on page 3 of our reply brief. The bottom line is that they, the court, misapplied the law that would say, look at the overall impression of these cans, one big and bright and neon and says Mountain Dew and has a beautiful lion on it, and the other that has none of those things. Third, this- I guess I take your point about the word versus the overall impression of the can, but is it really possible to separate them entirely? So isn't the fact that the word that is big and bold and occupying the top half of the can is the same word in both cases? Isn't that more likely to lead to confusion? So, like, if everything about the cans was exactly the same, but it was not the word rise, it was some other word on one of the cans, and so, right, there's a difference in the word, there'd be much less likelihood of confusion. Right. So how do we separate out this idea that they don't have a trademark on the word itself versus the overall impression? Well, first, the district court's opinion was based on their registered mark, which was not for Rise alone. It was for Rise Brewing Company, and I note, and it's in the record, that other companies own registered trademarks for Rise for coffee beans, Rise for soft drinks, and R-I-Z-E for another product. In addition, the way this court deals with this is best exemplified, I think, in the Lang case. There, the market issue was new choices, and new choices, the court said, was the focal point of both the plaintiff and defendant's products. But the court still said, when you look at the overall impression. There were a number of other factors as well in addition to the words, other similarities that the district court discussed. I mean, for example, they're both canned energy drinks. The use of the word Rise implies, you know, rise up to the occasion or rise in the morning. Things like in some stores on the same location, same shelf. So you factor all of that in. Why is this an abuse of discretion? Well, to unpack your question, Your Honor, the standard is abuse of discretion, as we recognize, on considering an appeal of a preliminary injunction. But, as now Chief Judge Livingston said in the Tiffany Costco case, the individual decisions with regard to each of the Polaroid factors are based on legal interpretation, and they're reviewed de novo. And Bristol Myers also says that the overall weighing of the factors are reviewed de novo. Now, going back to what Your Honor said in some of the questions, also in the question, is that when you have, forgive me, you were referring to which factors were you wanting me to talk about? I was just talking about similarities other than the word Rise. You know, the type of product, the market, you know, the marketing, those kinds of things. Well, let's get to the type of product, because one of the problems with the district court's opinion is that it conflated and said, oh, they have caffeine, they're the same thing. But leaving aside the differences that I said in the iconography and the size of cans, leaving aside the fact that our product is an energy drink that the record says competes with Monster and other kinds of energy drinks and is not a coffee. A consumer wanting coffee will get a coffee. They're not going to drink a- Well, the factor that we consider is proximity, right? Yes. So I take your point that a fruity carbonated energy drink is not the same thing as a coffee drink, but they're obviously closer together than, you know, an automobile and a toothpick, right? So they are closer in the marketplace. So there is a market for caffeinated drinks. There are some people who might be deciding between coffee and energy drink and some people who regard them as separate. So why is it erroneous to think about them as being relatively proximate? Well, it's erroneous in that the court, in keeping with other factors, too, just treated these products as being too much the same rather than following the law of this circuit. And I mentioned the Vitaraz case in particular cited in our brief. There, it was-proximity was given a hard look. And the court looked at-they were both snack products. One was crackers. One was-it could be used to dip sauce or something like that. And one was chips. But the court didn't-and they're both sold to grocery stores, unlike here where the evidence is that 70% of the time the Mountain Dew product is sold in small stores like convenience stores and gas stations as opposed to grocery stores, and that even when they are sold in those stores, they're sold in different sections and different aisles. But what the court did in this case, it said, look, one is a baked kind of product that doesn't have a lot of salt and is made of flour. One is a salty kind of product made with corn. It's a different thing. And for this court to lump everything in together, we believe, was legal error, not factual error. And then third, following on this, is that the court- Just to unpack that, why is it legal error as opposed to factual error? I mean, you just threw out a whole bunch of facts about the two products and then said it's legal error. So could you explain that conclusion? The difference, Your Honor, is that the facts aren't in dispute in the sense of there's no doubt that that's a coffee product. They're selling a coffee product in a seven-ounce can. There's no doubt that we're selling a fruit-flavored product in a bigger can. But the issue is, what is the legal interpretation of those facts? And that is the difference here. The legal interpretation- But does that mean that as a matter of law, a coffee drink is in a different market than an energy drink? Yes, and we have evidence and testimony from witnesses that say that that's how the industry recognizes these- But the fact that there's testimony and evidence suggests it's a factual question. I appreciate that, Your Honor, but there has to be some testimony that explains what the market is. The point is, in our plan- But couldn't you have a coffee-flavored energy drink? I mean, aren't there ways to imagine these products becoming pretty proximate? Well, they're not so now, and that's the key thing as to what was- I'm kind of surprised by your arguments in your failure to mention what seemed to me to be the largest weakness in the district court's analysis, is on the pure issue of law, which has to do with the Abercrombie strength, the inherent strength of the- the inherent lack of strength of the mark. Now, the district judge did classify it as a suggestive mark, but on the issue of the strength of the mark, the judge gave huge importance to the fact that the coffee drink had spent $17 million on publicity, which is not about the inherent strength of the mark, but only about acquired strength. It doesn't seem to me to really say very much given the size of the U.S. marketplace. And the weakness of the suggestive mark when used for coffee, and this is- it's interesting that the name of the plaintiff is Rise and Shine, which gives context to Rise. It's a coffee drink which is supposed to perk you up so that you can rise and shine in the mornings. This is- this seems to me to be a very weak mark as a matter of law. And the- one of the most important policies of the trademark law is, on the negative side, not to give anybody an exclusive right to- a right to exclude others from using the language in its ordinarily understood implications, preventing others from using the mark as Pepsi-Cola is using Rise in an energy drink that carries some of the same implication. Rise- get energy in Rise. Wake up in the morning with coffee in Rise. The law does not- the trademark law doesn't contemplate giving somebody exclusive rights over that kind of a thing. I'm surprised that that doesn't seem to play a part in your argument. Your Honor, if I didn't make that clear, that was my fault, because our first point was that the Court merely said, oh, it's a suggestive mark, and said it's strong. But as the Court's cases say, and I'm really glad you raised that point, because your own opinion in Guthrie bears directly on that in talking about the policy concerns when you have an arbitrary or a fanciful mark where there's an unlimited number of them, where it's okay to bring broad protection versus the very deep concerns about speech and competition when you have suggestive or descriptive marks. And here, as Judge Chin alluded to, everybody's using this word Rise in its ordinary sense to refer to the morning and to, you know, rise and shine in the morning, as does all the 150 uses of third-party use, among many others. Is the Mountain Dew drink supposed to be drunk in the morning? Pardon me? Is the Mountain Dew Rise drink? It can be drunk all day, but it's... I know it can be drunk all day. I understand that. But is the use of the word Rise about getting up in the morning? It's certainly part of the use of the name was intended for the morning occasion, that you would get up in the morning and you would enjoy this, but it's used through... But it's, I mean, it communicates giving you energy. That's right. That's right. And it's like zest and verve and the like. And that's why, also, this fundamental differences between when this is a suggestive mark versus an arbitrary mark. Also, Your Honor, relates to, as we said in our brief, the Shore case, the Proctor and Gamble case that Judge LaValle, you also designed it as a district judge, where, in part, you said that when marks are common words, that they are entitled to less protection and the consumers who are accustomed to understanding and seeing those common words would be more apt to notice differences than similarities, which goes back to... Well, it's not so much when they're merely a common word, but a common word used with its common meaning. That's right. Used to suggest its common meaning. If you have a common word that's used in connection with something that has no relationship to the common meaning of that common word, that's an entirely different matter. Agreed. I'm not talking about in the arbitrary setting, but in a setting like this where, at best, the mark is descriptive. And that's why, when you look at all of these cases, whether they're the Langmuir choices or the Sport Stick or the Autumn case, the Lieber Brothers case, or the Western Publishers Golden case, all of them, they may start with classification, but they don't stop there. They say, oh, let's look at the origin-indicating qualities of the mark. And here, the origin-indicating qualities of the mark are weak because it is a common word. Was the district court, did they really, did it really rely on this factor? So the strength of the mark factor, the district court said, tilts only slightly in favor of Riseborough & Company, right? You're right, Your Honor, but it certainly relied on it. And it also then, though, compounded that by overly weighting, I think, this factor with regard to similarity. But then the court compounded it. But it seems to me that the first factor, that the mark is a weak mark, and that that's a factor that strongly favors Pepsi-Cola, not slightly. It seems to me that's an error of law in the district court's analysis, is finding that it in any manner favors the coffee maker. That's right, Your Honor, and I think that's the fundamental error with the case. And it also, not only is it bad law and inconsistent with this circuit's other cases, it's bad policy and creates a very difficult time for companies, not just PepsiCo, that rely on the crowded field. Can I ask you about the significance of the Mountain Dew mark? Sure. All right, so in the Dentine Ice case, we put a lot of significance on the fact that the Dentine mark was put next to ice, right? And does it make a difference that it says Mountain Dew in the Mountain Dew style on the bottle? Yes, because by saying Mountain Dew on our cans, that's saying it's a Mountain Dew product. Their cans don't say Mountain Dew. So a consumer is not going to look at one of their cans and think of Mountain Dew. And I think that this court erred there by saying that because this was a reverse confusion case, somehow the house marks weren't relevant or maybe actually led to confusion, which is wrong in light of the Gillette case. That's flatly wrong. And also, as then-judge, now Justice Sotomayor, in the Playtex case writing for this circuit, said that where the junior and senior marks are not identical, which they're not here, the presence of a trade name would tend to militate against a finding of confusion. And the court disregarded that. The Mountain Dew mark is one of the most famous marks in America. It has a jagged, colorful, fun iconography and consistent with our lion and the rest of it. And the court disregarded that. And the court also, in terms of its errors, misapprehended the test for actual confusion, which looks as to whether— So how do we weight the presence of a house mark? Is it dispositive or is it one factor to be weighed? I mean, it's not implausible that Mountain Dew would have some products where it puts its own house mark on them and other products where it did not, right? In the record, it states that there isn't a single product where we—that if it's a Mountain Dew product, that we didn't say it was a Mountain Dew product. It would be foolish to not use your famous, valuable mark on all your Mountain Dew products. Well, unless you were trying to get the fancy coffee market or you were trying to break into it, I suppose. If you were, then why use Mountain Dew? I mean, that wouldn't have made any sense to do that. And this was an energy drink that geared to the monster and people like that. But going back to the issue of actual confusion, this recorded inquiry as to whether consumers were actually confused into believing that RBC's products were, as they contended, the coffee version of Mountain Dew. We had a classically done survey showing no confusion. They had ample time to do a survey. They don't deny that they had ample time to do a survey. But they didn't do a survey showing the opposite. Even though their theory of the case, as they said in their briefs, was right after we launched, there was rampant confusion. By the time our survey was done in July, that was four months after launch, we had sold 30 to 40 million cans. We had 4 to 5 billion commercial impressions with playoff commercials and things like that. And $20 million or more in advertising. In that scenario, if there was confusion, a survey should have detected it. Our survey didn't do that, showed that there wasn't. Merriam-Webster says that when a court, when a litigant has the opportunity to do a survey but doesn't do one, that should be, an inference can properly be drawn against it. And that's so here. Instead, the court relied on anecdotal evidence from Reisenstein's own employees of confusion. But as we've seen- Well, those employees were talking about what the people who stopped, grocery shelves were thinking and so on, right? Exactly. It's not just the employees who were confused, but they are reporting on what other people, the confusion of third parties. That's right. But critically, in light of Merriam-Webster, those third parties, like grocery store folk and casual acquaintances of them and industry contacts, weren't consumers. Merriam-Webster says you need to look at- Wouldn't that be even more discriminating than consumers? Pardon me? Wouldn't the people who stopped grocery store shelves be even more discriminating than consumers? No, not necessarily, especially if someone's saying, hey, I'm from Rise. It seems to me these arguments go to the weight of the evidence. How much weight do we give to the anecdotal evidence? How much weight should be given to the expert? They make some pretty good arguments on the side that you didn't call the expert. You could have. And so who knows who's right or wrong, but it seems to me that these are things that a trial judge takes into account. Let me unpack it, Your Honor. In terms of not calling the expert, the hearing was only two hours and all the declarations were in. I'm just saying you may have made good reasons, but it's difficult for me sitting here to second guess that kind of thing. They did call their expert. You didn't call your survey expert. I mean, so it's hard to really understand the significance of all of that. Well, let me try to help with that. Again, this was one of those times where all the directs were in. The person could have been called, but his affirmative step was already in. They chose to criticize him and critique him through their expert who they did call. So that served that function. But what that expert said, largely, was that, well, the survey was premature, that it wasn't done, it was done too soon. But as I've just indicated, that's not true as a matter of law. And also, as a matter of law, this isn't a question of weighing the evidence. The question is- I'm sorry. The survey was not done too soon as a matter of law? Forgive me. What I meant was there are cases that say if there's the opportunity for confusion to have occurred, it's not like a prelaunch situation or that maybe someone's just in a little test market or something like that. There was the opportunity where they could have come forward with a survey to actually test what people thought. And they didn't do that. And so then, in terms of weighing the evidence, what we're saying is something different. We're not saying weigh the evidence. As we detailed in our reply brief, we tried to methodically go through all of their evidence of actual confusion. And when you do that, you see that it either isn't based on consumers, is de minimis, as Nora Beverages says, you need an appreciable number of consumers, which is what surveys are a proxy for and anecdotal evidence isn't. Their inquiries, which Nora Beverages says is not relevant, or their forward confusion, which doesn't bear on their sole theory of the case, which is reverse, or their oral communications where somebody says, hi, I'm from RISE, and what about this and what about that? And the problem with that is that that doesn't reflect the marketplace conditions of what consumers would see. Also, I suppose you'd say it's based on the word and not on the presence of the mark, the appearance of the mark. Well, the words don't exist in a vacuum. Words have to be, in trademark cases, tied to the marketplace conditions as to how consumers would see it. And so you see the can, or potentially television commercials showing the can, but that is what consumers would see, not telephone calls to stock boys and things like that. And there's law to that effect because, again, in the Starbucks-Charbucks case, there the court excluded a telephone survey where the Starbucks people had someone call up and say, hey, what about Charbucks, what do you think of that? I think we have that argument. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the appellee. Thank you. Mr. Tank. That's as high as it goes. May it please the court, my name is Paul Tank. I'm here on behalf of the appellee, and I'm with Alston and Berg. For the reasons discussed in the November 4th opinion from the court, the plaintiff has made a strong showing of likelihood of success on the merits. The plaintiff has shown irreparable injury, absent of preliminary injunction, and the public interest favors protecting Plaintiff's Mark. The court found that the plaintiff offered credible evidence on incidents of actual confusion, the likelihood of confusion, and irreparable harm. And the district court did not take the cavalier approach that PepsiCo now insinuates. The court held two hearings, one in September, one in October. It heard testimony from nine live witnesses. It received further testimony from witness declarations. It heard expert testimony, and otherwise allowed for multiple rounds of briefing on the issues. Each aspect of the district court's analysis and ruling was thorough, thoughtful, well-reasoned, from the summary of the pertinent law applying the polarity factors to the descriptions of the evidence to the ultimate findings of fact and determination that a preliminary injunction was warranted. And, in fact, based on the substantial evidence presented, the district court found that Reisbering had not only shown a likelihood of success, but a clear or substantial likelihood of success on the merits. That's in footnote three of the court's brief. When you were first applied for a trademark, you were rejected on the grounds that there already were a number of Reisberg especially with respect to coffee. And you eventually prevailed by changing it from Reis Coffee to Reis Brewing on the argument that there was room for more of it. There was room for one more, especially in view of the fact that there were already quite a number of Reismarks. Now you're saying there's no room for another one. Only you can have it. How is that? With your eyes open, you were entering into a field in which there were already a number of different rises. But you, with the open eyes, entered into that field choosing to use a suggestive mark that claimed a quality. This will perk you up. This will make you rise and shine in the morning. And now you want to say, well, we're the only ones who are allowed to do that, including people who are using a similar suggestive mark, not for coffee, but for an energy drink. So it's not directly competitive. So, Your Honor, I think our position is not that nobody else can use the word rise. What the court did and what we've been arguing is that nobody can use it in a holistic way in which Mountain Dew Rise have been presenting it. No one else can put a canned, caffeinated energy drink side-by-side on the store shelves, which is what they did. We have evidence in the record that it was not only side-by-side, but four to six feet in most stores, gas stations, supermarkets, everywhere we were, they were four to six feet away. And so the point is it's not that nobody else can use the word rise. It's nobody else can use the word rise in the way it's being used and applying all the factors of the Polaroid factors. And with regards to the USPTO statement that Your Honor raised, again, that was on a different application that was made six years ago. And, in fact, the United States Patent and Trademark Office rejected the argument that was made that the shared rise term was weak and that the term rise should not be given a narrow scope of protection. The district court heard these arguments. It weighed these statements. And it's also important to note that trademarks are dynamic in that they can gain or lose strength over time. It's not about how strong the mark was back six years ago. It's about how strong it is today. So you think you basically took over the word rise? We did not take over the word rise. But what we did do is we are, you know, despite the hundreds of registrations or whatever the number of registrations they cite, what they failed to put into the record, and this is the Scars by Vera case, it's a very important case, and it says that registrations aren't the name of the game. It says that you need to also look at the, what is the evidence of the consumer's perception of those registrations in the marketplace? And there was no evidence that any of those other rises are on the marketplace. And, in fact, there is no testimony because it's not, the only person on the shelves in the functional beverage section, in the beverage section, is our product. We spent $17 million. Not in the marketplace. I don't know. It was in the record. There's like rise kombucha and vitamin water. That's in Canada. Those exist, right? Yeah, so that one's in Canada. That's the point, is citing these registrations without the evidence of whether they're actually being used. So if rise kombucha was being sold in the United States, would you have a trademark claim against them if they expanded the list? So, again, the trademark doesn't go to who's using the word rise, but you have to look at how it's being used, the proximity in which it's being used, the similarity of the two marks. You're looking at the bad faith. So we have to abstract from just the use of the word rise, right? Absolutely. You have to look holistically. So if, in fact, the district court did heavily weight the word rise and say, oh, consumers are going to be confused because there's one drink called rise, another drink called rise, that would be erroneous, right? But that's not what the court did, right? If you look at pages 14 through 16 of the court's analysis. I understand you're saying that's not what the court did, but that would be erroneous. You don't dispute that. If the court did not do a holistic analysis, that would be a problem. But the court did. If you look at page 15, it says here the two marks are confusingly similar, and it goes through the holistic analysis, as Your Honor pointed out, going through the typefaces, going through the Mountain Dew mark, whether the house mark was important or not, looking at our house mark. It did not just look at the word rise. And, in fact, it actually criticizes Pepsi for not doing a holistic analysis. If you look at the courts on page 16, it actually states that, called out Pepsi for, quote, not considering the parties' respective marks holistically. The court did this holistic analysis. It looked at the can. It actually had the size of the cans that's in the appendix. It had the typeface, the capital letters, the colors, the placement. And the reality is this, Your Honor, Your Honors, is these products were sitting side by side on the shelf, both in all bold letters, dominant portion of the marks being the word rise, and that's a problem. And there was actual confusion. There was confusion. There was testimony in the record from tastings where there were tables that were set up with the rise brewing mark and the rise brewing cans and the rise brewing T-shirts. And the normal reaction of the tasters was, oh, this is Mountain Dew coffee, looking at our product. That's actual confusion, reverse confusion. One of the risks that one takes on when one chooses a mark that is weak and suggestive and chooses it as weak and suggestive, like calling a coffee drink that's supposed to perk you up rise in the context of rise and shine, one of the risks that you take on is that there will be some confusion because the reason for the confusion is that you have chosen a mark that for its suggestive qualities and other people are entitled to use a word like rise for the same suggestive quality. You can't exclude them from doing that. But you've run the risk that there will be confusion when they do. And you did that furthermore in the context where there already were a whole bunch of marks that were known about for rise in the context of drinks, coffee drinks, drinks that were supposed to perk you up and make you feel like rising, rise. So that's something, a risk that one takes on when one chooses a weak mark. And I don't see how it cannot be a very problematic if not determinative error of law that the district judge failed to recognize that and failed to notice the, I mean, gave you credit as to the first and extremely important factor, strength of the mark. I mean, that's the weakest part of your case, as I see it. So, Your Honor, I think the important thing is, again, the strength of mark factor is one of the factors. And you have to also look at – Yes, but it's a very important one. Your Honor, the strength of mark factor is viewed in context with the proximity, with the similarity of the mark. So we've never taken the position that nobody can use the word rise. That's not the argument that was made, nor was that the argument that the court rested its opinion on. When the court looked at the strength of mark, it did the proper analysis. It did the two-step analysis. The first step was to look at the conceptual strength. And that's looking at whether the mark is descriptive, whether it's suggestive, or whether it's arbitrary. And there's no dispute by Pepsi, by Rise Brewing, or the court that this was a suggestive mark and that it's given inherent distinctiveness. And to your point, Judge LaValle, that doesn't mean you stop there. You don't just say it's suggestive, it's inherently distinctive. Favor goes to – Inherently distinctive. I mean, do you dispute that you're both using the word rise in its ordinary meaning? We're using it in its nondescriptive way. So the idea is rise is not descriptive of the product. It's suggestive of the product. And so the court – Highly suggestive of what the product is supposed to do for you. So what the court in the circuit does is it typically looks at the conceptual strength and determines what category it would fall into. Here, there's no dispute it fell into the suggestive, inherently distinctive category. But it then looks at the next step, the commercial strength, the market distinctiveness. And that's where the court – this court typically looks at six factors to determine that commercial distinctiveness. It looks at the ad expenditures, the media coverage, the sales success, the length and exclusivity of the mark. And it did that. And it walked through each of those buckets. And it found that there was $17.5 million of building that brand. There was seven years of continuous and commercial use that preceded Pepsi's first use. There was numerous awards won. There was unsolicited media coverage. So these are all things that tend to take that mark and make it stronger. And so what the court then heard was arguments about the USPTO statements, about the registrations. All of that, it weighed that. And that's where, Your Honor, it's not clearly erroneous. There was no abuse of discretion. The court heard the testimony. It weighed the evidence in the strength of mark. It didn't say it overwhelmingly favored Rye's Brewing, the appellee. It just slightly favored. And the strength of mark, then if you look at that in the context with the similarity, the holistic analysis, the proximity of the products, the actual confusion that was happening on the ground, this is precisely why the trademark laws exist. It's to prevent two products showing up on the shelves in the same aisle, side by side, and having retailers and consumers being actually confused. So what's the harm to Rye's Brewing Company? So let's say there's confusion. What is the nature of the confusion that causes harm to you? So the harm is the court found that the harm was irreparable and it was an existential threat. It heard testimony from investors in Rye's Brewing that pulled their money. Well, that's a second-order effect. I'm just asking, so the nature of the confusion is they will think that Rye's Brewing Company coffee is, in fact, a Mountain Dew product? Is that the nature of the confusion? The confusion is that there is some sort of a sponsorship or affiliation between the two brands, and we are a brand that's an organic, better-for-you, limited-ingredients product. The Mountain Dew energy product, which it's been renamed to and it's been on the shelves now for seven or eight months, they've just changed the name from Rye's to energy, and life went on. The point there, though, is that that product is full of artificial sweeteners and all sorts of things that— Doesn't that distinguish the two products, right? So I understand once you have a finding of confusion, maybe that indicates that there's going to be harm. But if, in fact, one is an organic coffee drink that is dairy-free and has organic ingredients and so on, and the other one is a fruity soft drink that is a version of Mountain Dew, doesn't that mean that consumers will look at them and think they're different? So what's happening in this space is on the shelves—your Honor raised this earlier— there are coffee-flavored energy drinks. So what happens is in the energy aisle, you have your energy drinks, you have your coffee energy drinks, you have your coffee drinks, and they're all mixed and matched in the same aisle in the same section. And so what happens is people are looking at our product and thinking it's affiliated with Pepsi, with the Mountain Dew product, and vice versa. There's also forward confusion. They're seeing the Pepsi product and thinking that we somehow gave away a license to our brand to Pepsi, and it pollutes the thesis. There's testimony in the record about it polluting the thesis. But is the harm that consumers are going to think it's not truly organic, or they don't like buying a coffee from a big company like Pepsi, or what is the actual— It's all sorts of things. It's all sorts of problems. And that's the problem is you spend all your time, money, effort, and life, the co-founders, building this brand, and spending their entire essence in putting into it and making it to be one thing, and then Pepsi comes along and just takes it. Whether it's plausible, there's actual confusion. I'm trying to get what the consumer is thinking, right? So your argument is you invested all of this money. You're marketing this drink that says it has organic ingredients and dairy substitutes and all of that. And then Mountain Dew comes out with Mountain Dew Rise, which is a fruit-flavored soft drink. But because of the impact of the label, people will assume that Rise Brewing Company coffee drink is not truly organic because they don't believe that Mountain Dew would use organic ingredients, or they will think it's lower quality because they think it's made by Mountain Dew? I think it's the affiliation and the sponsorship, the relationship, and the brand. It's like you're looking for customers who don't like the idea of buying a Mountain Dew product. Is that the harm? I think we're looking for all customers, but the idea is it pollutes the thesis. The idea is we are trying to be a better-for-you, better-than brand in using these things. And if consumers are believing that your affiliator is sponsored by— So people think Mountain Dew is not good for you. And so if they think that your product is made by Mountain Dew, they won't believe your claims that it's good for you? Correct. Correct, Your Honor. They will believe that this Mountain Dew product that has been doing what it does is not going to be putting out an organic, better-for-you drink, and therefore the affiliation sponsorship pollutes the thesis. Now, do we have evidence of that sort of confusion? I understand that there's this evidence that people stocking the shelves thought there might be some kind of association between them. But do you have evidence of consumers who made this judgment that Rise Coffee Company Nitro Brew isn't good for you because it must be a Mountain Dew product? So we have all sorts of confusion. There was confusion from the tastings, as I talked about earlier, where people would walk up to the table and say, oh, this is Mountain Dew coffee. There was the stockers that were placing them right next to each other because they thought there was affiliation between the company. We had mistaken purchases where people were trying to buy our product and instead the retailers purchased the Mountain Dew Energy product. So all this confusion has many different impacts. It's not just one type of confusion. But the idea is when a retailer buys the wrong product, that's harm to us. And when a consumer makes a connection between Mountain Dew and our product, that is a harm to us. And there's also another confusion. This is actually to your point. Actually, my co-counsel raised this to my attention. There was a marathon called the Flying Pig, and they were looking for sponsorship from Rise Brewing. And they were very excited about the idea that it was a better-for-you drink. It would be great for the marathon. We could put it out there. And then all of a sudden it got cold feet. And when our salesperson asked the sponsor, the marathon runner, why didn't you pick us up as a sponsor? They said, well, we saw your product in the store shelves. We can't believe you guys have artificial ingredients and do all those things with your product. And we said, well, what are you talking about? It doesn't have artificial ingredients. And they said, well, we saw it. It's a chemical-filled drink. And they had confused our product with Mountain Dew, and we lost the sponsorship. We eventually got a smaller sponsorship later on. But the idea is this is the sort of kind of confusion where people want it for a marathon because it's a better-for-you drink and then decide not to give us the sponsorship. There's countless ways of confusion that can happen. So can I ask, so you made a lot of comments about all the investments you made in the Rise Brewing Company mark. So what is the role of the Mountain Dew house mark on the product? So it does seem like Pepsi has invested a lot of money in making the Mountain Dew mark very recognizable. So if the question is reverse confusion and you have a product that has the Mountain Dew mark right there on top of the word Rise, why doesn't that mitigate the confusion? Right. So in reverse confusion cases, which this is what the court ruled on, it's been held that the house mark actually aggravates the confusion. It doesn't alleviate the confusion. The Second Circuit, I'm going to quote from a Southern District of New York case, but it's quoting, and it says the following. This is the THOIP case. It says, quote, the Second Circuit has endorsed the view that in reverse confusion cases, the use of defendant's own name, house mark, increases the misappropriation by linking the defendant's own name to the plaintiff's goodwill established by his trademarks. And the cases that Pepsi cited, the court recognized this in her decision, the court stated that, you know, the cases that Pepsi cited for this house mark are forward confusion cases or they're cases where the house mark was the dominant portion of the mark. You know, the dentine is overwhelming. And so the point here is in a reverse confusion case, you have the junior user that's overpowering the senior user. Pepsi is overpowering us in the marketplace. And by putting their stamp of Mountain Dew, small, but putting it on there, it's aggravating. If, in fact, the product was not called Mountain Dew Rise but was just Rise or Rise Energy, so it just said Rise and it said Energy along the side the way it does, but you took off the Mountain Dew mark, you'd say you'd have a weaker claim. It's, you know, the way the can looks, I think it would be a very small difference because of the way the holistic analysis would still be the way it would come out. But the Mountain Dew actually doesn't alleviate, it doesn't help the case for Pepsi. Because your whole argument is that they're going to think that your product is a Mountain Dew product. Correct. Okay. So, you know, Your Honor, I mean, I know I'm over time. I know you gave opposing counsel more time, and I'm happy to use more time. But at the end of the day here, what we're dealing with is the district court heard nine live witnesses, had a thorough record in front of it, and there's no dispute that she applied the correct law. It was the Polaroid factors. Walked through each Polaroid factors, and if you go through each one, weighed the factors and the evidence within each one, that's reviewed for clear error. That's not reviewed de novo. And, you know, under this clearly erroneous standard, the reviewing court must give due regard to the trial court's opportunity to judge the witness's credibility. And this court is not to second-guess the court's credibility assessments. And when there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. And even in the strength of mark, Judge LaValle. That doesn't account for it. That doesn't. What you're saying is all correct as a proposition of law, but it doesn't account for the district court making a serious error with respect to the analysis of one of the most important factors, which is purely a question of law. Your Honor, respectfully, the court weighed a number of pieces of evidence in determining the strength of the mark and looked at, again, the six factors, the commercial strength factors, and walked through each one of them. It recognized the USPTO statements. It recognized the registrations. It evaluated all of that information. It weighed it all and determined that it's slightly favored. That is not an error of law, and it's certainly not clearly erroneous under the standard. When she has an opportunity to weigh that evidence, that, you know, to say that she got it wrong because you can't just discount all the other evidence. And I think here, again, if you look at what's happening, we're not saying that nobody can use the word rise. We're saying that nobody can use the word rise in the way that PepsiCo has used it on a single-serving caffeinated canned drink that sits two feet away from it on the shelf. What do you make of the fact that the mark, your mark is registered only for coffee drinks, coffee and coffee substitutes? As you know, on the registration, it has those limited categories. Is that probative of whether its use in a different context would mean something different? It's not, Your Honor. The categories or the classes of goods in which it's registered don't limit the extension of the rights in which you can stop someone from using your trademark. So the class of goods is more for a record-keeping and this is beyond, I'm not a trademark prosecutor, but my understanding is that it doesn't prohibit you. If you're registered in one class, it doesn't mean you can't sue somebody outside of that class. Right, but might it be probative of whether we think that the products are proximate? Well, the proximity analysis was probably the most heavily contested and the most voluminous of testimony. And Pepsi had its witnesses getting up and saying, they're on opposite sides of the store shelves, they're on different sides of the store, they're not in the same stores. And then I heard RISE's employees testifying that they're literally side-by-side or four to six feet, they're in all the same stores in the same aisles. And the proximity factor, the court heard all that and weighed all that. And the fact that one is registered for energy or coffee or for something else is not a factor that's weighed in the proximity analysis. The proximity analysis is weighed by the trade channels and the competitive proximity. So the trade channels and the areas of commerce and the geographic regions in which they play. It's not the registration. I think we have that argument. Thank you very much, Mr. Tank. And we'll turn it back to Ms. Sindali on rebuttal.  It's clear that as some of Judge LaValle's questions indicated, that RBC having knowingly entered a market and chosen a mark using a word for its normal, suggestive kinds of qualities is trying to monopolize that word beyond the area of its registration, which is for RISE Brewing Company, not RISE alone. Others own that. And beyond its registration for coffee, which others also are already in. And I think that this Court's Plus Products case has some helpful language where it said, one who devises a new, strange, catching word, like a coin word, a made-up word like PepsiCo, to describe his wares may and often has, by timely suit, prevented others from taking his word. But one who takes a phrase which is commonplace must be content with that special field, which he labels with so undistinctive a name. And that's what the heart of this case is about. They went into a crowded field, and now they're acting like they're Google or Kodak or Exxon. And they aren't. A couple of other quick points to correct some things. We are not just relying on registrations. We're relying on actual use. The record at A334-335 and A475 explains that, and A392-402. In addition, this Court does give deference and look at registrations, as the Estée Lauder, the Golden Books, and other cases say, both within this exact field and outside. And I commend to the Court the- Well, what weight does it have? I mean, certainly you don't take the position that if you created a fruity, energy soft drink that had the word RISE in red, bold letters, and it said RISE Brewing Company on top of a golden sun, that you would be able to do that. There wouldn't be infringement, right? No, and we haven't- So what weight does it give that Mark is for the coffee context? Well, because when there's a crowded field, as the case I just said and others we cite in our brief explains, you have limited rights for what you are doing, not to broadly exclude others from using a word in its ordinary kind of way to describe what it- Yeah, but it doesn't seem like your argument is limited to the context, right? I mean, I think you're suggesting that even in the coffee context, if somebody else uses the word RISE, it still would be a weak mark. Yes, it's correct. So what weight does it have that the mark is for the coffee, for coffee products? All I was trying to say, Your Honor, maybe I'm not understanding your question, in which case I'll try again. All I'm trying to say is this is a mark that's diluted and weak, even for coffee. It certainly has even less rights to try to get into fruit-flavored drinks and other categories. That's all I was trying to say. And I was trying to also say, and I commend the Petro case in the Fourth Circuit that said it is useful to look at and consider applications and registrations, even in the absence of use, though here we have use, because it helps show how ordinary a term is and non-distinctive. The third point I'd like to make is that you heard a lot about their employers speaking to people and their evidence of what they say is actual confusion. But what you didn't hear was any rebuttal or disagreement with my statement that we also said in our briefs that they had the full opportunity to do a survey and that they didn't do it, and that confusion had already, in the four months of our wide-scale giant launch, that they had the opportunity. So I understand you're saying they should do a survey, but is that not evidence of confusion, the sponsorship of the marathon or the taste testing? No, it isn't, Your Honor, and that's why it's difficult. It's not evidence of confusion at all? No, because the marathon is evidence of, even as it went down as the way counsel just said it, would be at best forward confusion, and this is a reverse confusion case. We explained that in our reply brief. But beyond that, the- Oh, because what they did is they came back and they said, we saw your product, and they looked at the Mountain Dew product. Exactly, exactly. So it would have to specifically be reverse confusion, you think? That's right, because that's the only theory that they went on before the court. In the court's opinion, this is a reverse confusion case. And the other problem with it is, as I was alluding to in my own remarks, that started with a phone call where the person said, hi, I'm the people from RISE. So that situation with those marathon people, they weren't looking at our packaging. That wasn't the normal marketplace reality. I take your point about forward confusion, but the account of that incident is that they did go to the store and looked at the product. I don't think that that's- I think what they said is they went to the store and looked at our product, PepsiCo's product. Right, your product. Not that they saw their product. I think I get the point. That's all. The other thing is, counsel mentioned, though admittedly did not elaborate, on irreparable injury. I did want to point out here, because this is to me also important, they knew about what we were doing months before we launched. We advertised this in the fall of 2020. They wrote us a letter on January 11th. On January 26th, we wrote back a letter saying, in detail, it wasn't just a one-paragraph letter saying, no, no, no, this is wrong, this is a weak mark. And they did- I think we have that argument in the papers. I guess I'd just like you to respond to also the point about the presence of the housemark, because you were putting some emphasis on that. And so opposing counsel points out that actually it becomes worse in a reverse confusion case if there's the presence of a housemark, because then it's more likely they'll think that their product- or consumers will think that their product is a Mountain Dew product. So what about that? That is wrong as a matter of law. And the FOIP case to decide was one of my cases that we won. So I'm very familiar with Judge Shinlin's decision. I think that the key thing is that, one, the Gillette case of this court said specifically that the presence of the housemark helps in forward and reverse confusion situations. And then secondly, I go back to just now Justice- But why? I guess you're citing the cases. So what's the reason? So his argument is plausible. It's like if you put your housemark on something that says rise in big, bold letters, it will make it more likely that people will think other products that say rise in big, bold letters are Mountain Dew products. So why isn't that a problem as opposed to a help? Well, because the issue is that if you- consumers are accustomed to seeing a housemark on something, and they're going to think that if it has the housemark, then it comes from that company. And if it doesn't have the housemark, it doesn't come from that company. So you're saying consumers will see Mountain Dew Rise, and they'll say, oh, that's a Mountain Dew product. Then they'll see Rise Coffee Company, and they'll say, well, it's a Rise product. But if it were a Mountain Dew product, it would have the housemark. That's right. That's your argument. That's exactly right. That's exactly right. And again, Justice Sotomayor, in the play text, then Judge- But of course, I mean, it is possible that you might have products where you use the housemark in times that you- We had this conversation already. I think I have the argument. Yes. But again, all of that could have been tested by them if they had done an empirical survey, which we did, that showed there wasn't confusion. And that's the key thing. The bottom line- I don't want to overstay my welcome. The bottom line, Your Honors, is that I think that this is a case that was wrongly decided as a matter of law. I appreciate a hearing was held. But the legal issues, not only are wrong, but they're dangerous. And as we cited in our brief, the Law Review article by Professors Beebe and Fromer, and how it's very hard to clear marks these days because there's so many marks and so many companies out there. And if companies like PepsiCo and smaller and bigger companies, you know, look at a crowded field of all these uses and then are said, oh, no, you can't use it for your energy drink with Mountain Dew and Big Bright Letters, that's going to lead to more litigation that is- I think we have that argument. Thank you. Thank you very much, Ms. Sindali. The case is submitted. And because that is the last argued case this morning, we are adjourned. Do I stand adjourned?